**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOSE PARDO-KRONEMANN,**<br><br>       **Plaintiff,**<br><br>              **v.**<br><br>**ALPHONSO JACKSON, Secretary of<br>Housing and Urban Development,**<br><br>       **Defendant.** | **Civil Action No.  05-626 (JDB)** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Jose Pardo-Kronemann, an employee in the Office of International Affairs at the Department of Housing and Urban Development ("HUD" or "the Department"), brings this action against defendant Alphonso Jackson in his official capacity as the Secretary of HUD.  Pardo-Kronemann alleges that the Department retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et</u> <u>seq.</u>, based upon his prior Equal Employment Opportunity activity.  He alleges that the retaliation was manifested when he was reassigned from the Office of General Counsel to the Office of International Affairs and when he was placed on Absent Without Leave status for January 7 and 8, 2002.  Currently before the Court is the Department's motion for summary judgment.  Upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, the Court will grant the Department's motion.

**BACKGROUND**

I.     **Factual History**

Pardo-Kronemann is a Hispanic-American, who was born in Cuba.  Pl.'s Statement of

Material Facts Omitted by Defendant (Pl.'s Statement) ¶ 18.  He first worked at HUD in the Office

of International Affairs as a paid intern in 1977.  Def.'s Statement of Material Facts as to Which

There is No Genuine Dispute ("Def.'s Statement) ¶ 1.  Fourteen years later, the Department hired

Pardo-Kronemann as a grade 11 Law Clerk (entry level attorney) assigned to the Office of General

Counsel in the Public Housing Division/Office of Assisted Housing.  Id. ¶ 2.  The parties agree

that Pardo-Kronemann was unhappy working in this division, and he was therefore reassigned in

1994 to the Finance Division, Government National Mortgage Association, still within the Office

of General Counsel.  Id. ¶¶ 2-3; Pl.'s Responses to Def.'s Statement of Material Facts ("Pl.'s

Responses") ¶¶ 2-3.  Due to an alleged shortage of work in the Finance Division, Pardo-

Kronemann was reassigned to the Program Compliance Division within the Office of General

Counsel in 1998 or 1999, and he was again unhappy with his new assignment.  Def.'s Statement ¶

4; Pl.'s Responses ¶ 4.

The parties agree that Pardo-Kronemann "filed several complaints of discrimination and

retaliation prior to this litigation and that he filed the latest of these in April 1999."  Pl.'s

Responses ¶ 16.  In his informal complaint filed in 1999, Pardo-Kronemann alleged that he had

been retaliated against due to his prior Equal Employment Opportunity activity.  Def.'s Statement

¶ 16.  Three months later, he spoke with the Counselor to the Secretary, Howard B. Glasser, about

his dissatisfaction with his work situation.  Id. ¶ 5. During their discussion, Pardo-Kronemann

requested a "one year detail to the US Agency for International Development ("USAID"), with a

commitment to renew," "[t]wo within-grade step increases," and "[r]einstatement to HUD at the end of the detail period, preferably to the HUD Office of International Affairs or the GNMA Finance Division."  Id. ¶ 6; Def.'s Ex. 2 at 1.  After the Counselor worked out the USAID detail, Pardo-Kronemann indicated that he was instead interested in a detail to the Inter-American Development Bank.  Def.'s Ex. 2 at 1.  The Counselor then worked to make arrangements for a detail to that agency.  Although Pardo-Kronemann alleges that his resulting detail was part of an agreement to settle his pending claims of discrimination and retaliation, the Counselor made it very clear that their discussion and the resulting detail were "not a settlement or negotiation of any formal complaints," but were instead an "attempt to help out an employee who is looking for a more challenging and satisfying work assignment."  Id. at 2.  That same month Pardo-Kronemann withdrew his informal complaint.

Effective on November 29, 1999, Pardo-Kronemann was granted a six-month detail to the Inter-American Development Bank.  Def.'s Statement ¶ 7.  The Department also later granted his request to extend the detail until November 30, 2000.  Id.  After this time, Pardo-Kronemann did not seek another extension of his detail at the Inter-American Development Bank, but instead sought a detail to the Inter-American Investment Corporation.  Id. ¶ 8.  Pardo-Kronemann contends that "he was somewhat depressed because the agency refused to respond to the request" for this next detail, and he therefore requested leave without pay, which was granted from December 2000 through February 2001.  Pl.'s Responses ¶ 9.

In March 2001, Pardo-Kronemann returned to the Office of General Counsel and informed "Matthew F. Hunter, former Assistant to the Secretary and White House Liaison, that he was seeking either a political appointment or another detail."  Def.'s Statement ¶ 10.  Hunter "saw no

reason to spend additional HUD money on detailing" him to another office, and accordingly his request was denied.  Def.'s Ex. 3 ¶ 7.  According to Hunter, "[a]t or about the same time period that Mr. Pardo-Kronemann requested to go on detail again, [the Department] did not permit other HUD employees to go on details they sought, while budget and operational assessments were taking place."  Def.'s Ex. 15 ¶ 6.

From March 2001 through December 2001, although Pardo-Kronemann was technically placed within the Office of General Counsel, he "had no job description and it is unclear to whom exactly he was to have been reporting substantively."  Def.'s Mot. at 7.  Based upon Pardo-Kronemann's previous experience in the Office of International Affairs, Hunter gave him an assignment and asked him to prepare a background paper on the office.  Id. ¶ 11.  According to Hunter, Pardo-Kronemann took a very long time to complete the project, and when the final version was submitted, Hunter was disappointed with the results.  Def.'s Ex. 3 ¶ 6.  The parties agree that Pardo-Kronemann's "transition back to [the Office of General Counsel] 'was not working out satisfactorily.'"  Pl.'s Responses ¶ 11; Def.'s Statement ¶ 6.

Thereafter, General Counsel Richard Hauser asked Hunter to talk with Shannon Sorzano, Deputy Assistant Secretary for International Affairs, Office of Policy Development and Research, about a possible position for Pardo-Kronemann in her office based upon Pardo-Kronemann's "previous statements regarding his desire to work in the International arena."  Def.'s Ex. 11 ¶ 9; Def.'s Statement ¶ 13.  In the fall of 2001, Sorzano scheduled an interview for Pardo-Kronemann. On the day of the interview, however, she was running late for the appointment, and Pardo-Kronemann left before she arrived.  Def.'s Ex. 3 ¶ 8.  Although the interview was never conducted, Deputy General Counsel George Weidenfeller contacted Hunter again about an

appropriate placement for Pardo-Kronemann.  Id.  After Hauser, Weidenfeller, Hunter, and Dan

Murphy, former Chief of Staff to the Secretary of HUD, discussed the matter further, Pardo-

Kronemann was issued a directed reassignment from an Attorney Advisor position in the Office of

General Counsel to an Attorney Advisor position in the Office of International Affairs, effective

on December 16, 2001.  Def.'s Statement ¶ 14.  Pardo-Kronemann retained his same title, grade,

pay, and benefits after the reassignment.  Id. ¶ 15.

Carole A. Jefferson, General Deputy Assistant Secretary for Administration, and Lawrence

L. Thompson, General Deputy Assistant Secretary for Policy Development and Research,

instructed Pardo-Kronemann to report to the Office of International Affairs and his new office on

January 7, 2002.  Def.'s Ex. 5 at 1.  When Pardo-Kronemann learned of the reassignment, he

instead attempted to file a request for leave and failed to report to the office on the designated

date.  Def.'s Statement ¶ 16; Pl.'s Responses ¶ 16.  The Department asserts that Pardo-Kronemann

did not comply with established procedures for requesting approved leave from the Office of

International Affairs.  Def.'s Statement ¶ 16.  Thus, the Department sent a letter by courier

explaining that he was being placed on Absent Without Leave ("AWOL") status until he reported

to work.  Def.'s Ex. 14 at 1; Def.'s Statement ¶ 16.  Pardo-Kronemann thereafter reported to his

new position on January 9, 2002.

## II.    Procedural History

Pardo-Kronemann filed the current action on March 25, 2005, alleging that his

reassignment to the Office of International Affairs and his AWOL placement were retaliatory

based upon his prior Equal Employment Opportunity ("EEO") activity.  The Department has now

moved for summary judgment on Pardo-Kronemann's claims.  The Department contends that

Pardo-Kronemann's reassignment was not an adverse action, that Pardo-Kronemann cannot

establish a causal connection between the reassignment and his protected activity, and that, in any

event, he has failed to rebut the Department's legitimate, non-retaliatory reason for the

reassignment.   As for Pardo-Kronemann's claim regarding his AWOL status, the Department

argues that Pardo-Kronemann cannot establish a causal connection between the AWOL placement

and his protected activity and that, again, he has failed to rebut the Department's legitimate, non-

retaliatory reason for the placement.

## LEGAL STANDARDS

### I.     Summary Judgment Pursuant to Fed. R. Civ. P. 56(c)

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion

by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and

any affidavits" which it believes demonstrate the absence of a genuine issue of material fact.  Fed.

R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere

existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the

absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.    The McDonnell Douglas Framework

The framework for establishing a prima facie case of retaliation was introduced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of retaliation a plaintiff must establish: "(1) that she engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).  Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination.  See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at

802.  The employer's burden, however, is merely one of production.  <u>Burdine</u>, 450 U.S. at 254-55.

The employer "need not persuade the court that it was actually motivated by the proffered reasons.

It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

discriminated against the plaintiff."  <u>Id.</u>

 If the employer is successful, the burden shifts back to the plaintiff to show that the

employer's stated reason was a pretext for discrimination or retaliation.  <u>Reeves v. Sanderson

Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he

was the victim of intentional discrimination 'by showing that the employer's proffered explanation

is unworthy of credence.'"  <u>Id.</u> (quoting <u>Burdine</u>, 450 U.S. at 256).  But "[p]roof that the

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination."  <u>Id.</u> at 147.  Thus, the trier of fact may also

"consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn

therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  <u>Id.</u> (quoting

<u>Burdine</u>, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law is appropriate in any

particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's

prima facie case, the probative value of the proof that the employer's explanation is false, and any

other evidence that supports the employer's case and that properly may be considered on a motion

for judgment as a matter of law."  <u>Id.</u> at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial (and at
> summary judgment) will be on whether the jury could infer discrimination from the
> combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff
> presents to attack the employer's proffered explanation for its actions; and (3) any
> further evidence of discrimination that may be available to the plaintiff (such as
> independent evidence of discriminatory statements or attitudes on the part of the
> employer) or any contrary evidence that may be available to the employer (such as

evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also

Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the

McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a

legitimate non-discriminatory reason for its action, then, the question is whether that proffered

reason is a pretext for discrimination or retaliation.  At this point, the McDonnell Douglas shifting

burdens framework effectively evaporates -- the sole remaining issue is discrimination or

retaliation vel non, and "to survive summary judgment the plaintiff must show that a reasonable

jury could conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason."  Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530

U.S. at 142-43.  Examination of that issue in this setting therefore requires consideration of all the

relevant circumstances in evidence, including the strength of the prima facie case, any direct

evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is

false (which may be enough with the prima facie case to infer unlawful discrimination or

retaliation), and any properly considered evidence supporting the employer's case.  Reeves, 530

U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004);

Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

**DISCUSSION**

I.    **Reassignment to the Office of International Affairs**

    A.    **Pardo-Kronemann's Prima Facie Case of Retaliation**

Because Pardo-Kronemann engaged in statutorily protected activity when he filed his informal complaint of retaliation in April 1999, the parties agree that Pardo-Kronemann has met the first requirement for a prima facie case of retaliation.  The parties have differing views, however, as to whether Pardo-Kronemann has satisfied the remaining two requirements.  In a Title VII disparate-treatment suit, the D.C. Circuit very recently clarified that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not -- and should not -- decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas."  Brady v. Office of the Sergeant at Arms, U.S. House of Reps., No. 06-5362, slip op. at 7 (D.C. Cir. Mar. 28, 2008).  In a Title VII retaliation suit, the same principle certainly applies, but here the Department contests Pardo-Kronemann's ability to demonstrate that a materially adverse employment action was taken.  In light of this argument, and because the strength of the prima facie case is still relevant to the central inquiry of whether Pardo-Kronemann has demonstrated that a reasonable jury could conclude from all of the evidence that his reassignment was retaliatory, the Court will briefly address the parties' arguments in the prima facie context. Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  However, in keeping with the clear message of Brady, the Court will not decide whether Pardo-Kronemann has actually made out a prima facie case of retaliation.

The Department first argues that the reassignment was not an adverse personnel action

because it did not have "material consequences such that it would dissuade a reasonable worker

from making or supporting a charge of discrimination."  Def.'s Mot. at 6 (citing Rochon, 438 F.3d

at 1219-1220).  When Pardo-Kronemann returned to the Office of General Counsel following the

conclusion of his detail and his time off, the parties agree that he had no job description and

performed no work for that office.  Pardo-Kronemann contends that he was instead working under

the direction of Joseph Ventrone, an advisor to the Secretary, but he does not assert that he was

performing any legal duties.  Def.'s Ex. 1 at 146-47.  Indeed, the parties agree that for a substantial

period of time he was writing a background paper on the Office of International Affairs.

Nevertheless, the heart of Pardo-Kronemann's complaint regarding his reassignment is that it was

not a bona fide legal position that would fully utilize his law degree.  He argues that the reduction

in legal duties constitutes an adverse retaliatory action.

      As the Supreme Court has noted, "reassignment of job duties is not automatically

actionable.  Whether a particular reassignment is materially adverse depends upon the

circumstances of the particular case, and should be judged from the perspective of a reasonable

person in the plaintiff's position, considering all the circumstances."  Burlington Northern, 126 S.

Ct. at 2417 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)) (internal

quotation marks omitted).  The Department immediately points out that the reassignment adhered

to Pardo-Kronemann's previously expressed desire for a "[r]einstatement to HUD at the end of the

detail period, preferably to the HUD Office of International Affairs or the GNMA Finance

Division."  Def.'s Ex. 2 at 1.  Hence, the Department argues that this fact should weigh heavily

against a finding that the reassignment was a materially adverse personnel action -- i.e., that it did

not have consequences that would dissuade a reasonable employee from pursuing EEO rights.

Pardo-Kronemann's response is that his desires had changed at that point in time due to funding and project changes in the Office of International Affairs.  Def.'s Ex. 6 at 7, 14-15.

Pardo-Kronemann agrees that he "had indicated a willingness to consider a position in [the Office of International Affairs]," but he contends that was only "because [the office's] mission was not limited to research, as that office had about $10,000,000 for flood relief programs."  Pl.'s Opp. at 10 n.5.  Interestingly, he makes no contention that his interest in the Office of International Affairs was based upon any legal duties that he would be able to perform.  When the $10,000,000 had been dispersed, he claims that he no longer wanted to work there.  Thus, when he was informed of his reassignment to the Office of International Affairs in December 2001, he attempted to decline the position.  He therefore argues that the reassignment was involuntary, and the Department concedes that once the decision was made he did not want to transfer to that office.  Pl.'s Ex. A ¶ 6.  It is clear, however, that the fact that a reassignment is involuntary does not alone make it actionable under Title VII.  See Brody, 199 F.3d at 457.

Pointing to the position description that was drafted for Pardo-Kronemann, the Department argues that there was no materially adverse action because his title remained "Attorney-Advisor," and he retained the same grade, salary, and benefits that he previously had.  Def.'s Mot. at 7; Def.'s Ex. 9.  According to the position description, the incumbent "engages in legal research, particularly international and comparative research studies," "[p]rovide[s] advisory services, as requested, on questions of law and interpretation of regulatory and administrative policy in foreign governments and multilateral bodies," "conduct[s] research . . . for use in briefings, particularly insofar as they relate to legal and regulatory issues in housing and urban development," and "prepare[s] abstracts of the more significant legal developments affecting housing and urban

policies abroad." Def.'s Ex. 9 at 1-2.  Thus, the Department contends that his new position also

involved legal duties.  Moreover, the Department points out that unlike Czekalski v. Peters, 475

F.3d 360, 365 (D.C. Cir. 2007), where the plaintiff was lowered in the agency hierarchy based

upon her reassignment to report to a former peer, Pardo-Kronemann now reports directly to the

Deputy Assistant Secretary for International Affairs -- a higher ranking person than he ever

reported to during his previous time at HUD in the Office of General Counsel.  Def.'s Mot. at 8.

Pardo-Kronemann insists that the position description does not accurately describe his

duties, and that he instead spends the majority of his time conducting research.  Pl.'s Opp. at 7.

He argues that because the Department specifically made a new position in the Office of

International Affairs instead of placing him in a pre-existing position in the Office of General

Counsel, that demonstrates that his new position is not a legal position.  Id. at 6.  Pardo-

Kronemann argues that this demonstrates that there "were no duties or responsibilities in [the

Office of International Affairs] that were commensurate with [his] grade level or background."  Id.

He contends that despite the terms of the position description, therefore, a reasonable jury could

find that he "was no longer working as an attorney."  Id. at 7.  For further support, Pardo-

Kronemann points to the affidavit of his supervisor, Sorzano, who expresses her belief that "his

skills are not being fully utilized in the Office of International Affairs."  Pl.'s Ex. H at 6.  And he

points to the deposition of John Geraghty, another supervisor in the Office of International

Affairs, who states that Pardo-Kronemann uses "his legal background doing research," but that he

is not doing any attorney legal work similar to that performed in the Office of General Counsel.

Pl.'s Ex. P at 14.  Pardo-Kronemann's position description itself states: "Note: All professional

legal guidance regarding the formulation and development of the Department's international

programs and activities is received from the Office of the General Counsel." Def.'s Ex. 9 at 2.

Pardo-Kronemann also makes an unsubstantiated assertion that the reassignment has adversely impacted his career track and his ability to obtain a new job as an attorney. He claims that he unsuccessfully sought legal jobs at the Department of Commerce, the Overseas Private Investment Corporation, and the African Development Foundation after he was reassigned. Eventually, he claims, he "stopped applying for legal positions because [he] concluded that [he] would not be able to secure a legal position because [he] lacked the required current legal experience." Pl.'s Ex. Z ¶ 4. This argument is entirely speculative and lacking in proof. Essentially, it appears that Pardo-Kronemann chose to stop applying for legal jobs based upon his own conclusions about his current position, regardless of his previous work experience and qualifications. Nevertheless, drawing all reasonable factual inferences in favor of Pardo-Kronemann, it would appear that there is a genuine dispute of material fact as to whether he suffered an adverse personnel action based upon the reassignment of job duties. That would preclude the Department from prevailing on its motion for summary judgment based upon the absence of a materially adverse action.

The Department next contends that there is no causal connection between Pardo-Kronemann's prior EEO activity and his reassignment to the Office of International Affairs. Courts have held that "[a] plaintiff may satisfy this third element of a prima facie case [of retaliation] by showing 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'" Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006). Here, Pardo-Kronemann's protected activity occurred in April 1999, and he was reassigned to the Office of International Affairs two years and eight months later in

-14-

December 2001.  The Department asserts that this is too great a temporal gap to permit any inference of a retaliatory motive.

Title VII, of course, does not say that retaliation must be immediate for it to be actionable. But the case law does establish that, if the only circumstantial evidence of causation is temporal proximity between the protected activity and the alleged retaliatory action, then those events must be very close in time for that evidence to be sufficient for a jury to infer a retaliatory motivation. Hence, as the Department points out, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001).  Indeed, judges of this court have held that the passage of two months may create too wide a temporal chasm to give rise to an inference of a causal connection.  See Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003).  But it also is true that there is no hard-and-fast rule that any specified amount of time is too removed for an inference of causation.  Especially where a defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out a prima facie case despite a substantial gap in time.  See Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 69-70 (D.D.C. 2006).

Here, Pardo-Kronemann argues that his reassignment was made "'at the first possible opportunity' following his return from his detail to the [Inter-American Development Bank]." Pl.'s Opp. at 25.  A close look at the timeline of events, however, belies Pardo-Kronemann's claim.  His detail ended in November 2000.  Thereafter, the Department approved his request for leave through February 2001, and he returned to work at the Department in March 2001.  His

reassignment did not occur until <u>nine months later</u> -- after he had worked an ample amount of time in the Office of General Counsel.[1]

Pardo-Kronemann also argues that he can establish a nexus between his prior EEO activity and his reassignment based upon a comment Hunter made during the administrative hearing. According to Pardo-Kronemann, Hunter "unabashedly expressed hostility toward those with prior EEO activity." Pl.'s Opp. at 4. When Hunter's comment is read in context, however, it does not support Pardo-Kronemann's argument that Hunter acted on any retaliatory motive in reassigning him to the Office of International Affairs. During the hearing, Hunter was asked about the meetings that were held to discuss Pardo-Kronemann and his reassignment. The exchange between the attorney at the hearing and Hunter went as follows:

> Q.    At any of these meetings did the fact that the complainant had prior EEO activity, was that ever mentioned?
> A.    No.
> Q.    Was the fact that the complainant had prior EEO activity a reason or a fact in your suggesting that he be reassigned to the Office of International Affairs?
> A.    No.
> Q.    Did you know at the time of the meeting referred to here that he had prior EEO activity?
> A.    No. I mean I would know -- I would not have referred someone who might be viewed as a problem to another office to create another problem, I wouldn't have done that. I mean that was an important office for the Secretary, it was an important office for the Deputy Secretary, it was someone we were not trying to put the B team or C team, we were looking for an A team down there.

---

[1]Although the parties agree that Pardo-Kronemann presented himself as an advocate for Hispanic employees at HUD, he fails to point to any specific examples of protected activity that he engaged in following his 1999 informal complaint of retaliation. His complaint in this lawsuit does refer to a meeting that former Secretary Martinez and his former Chief of Staff, Phillip Musser, held with representatives from a Hispanic advocacy group on May 1, 2001. At that meeting, Pardo-Kronemann spoke about "the working conditions endured by Hispanics at HUD" and the "past discriminatory treatment to which Hispanics at HUD had been subjected." Compl. ¶ 13. The Court notes that this meeting, however, was also <u>seven months</u> prior to Pardo-Kronemann's reassignment and <u>eight months</u> prior to the AWOL event.

Pl.'s Ex. K at 51-52.

Although Hunter's comment might be interpreted to indicate that he viewed some individuals with EEO complaints as problem employees, Hunter specifically stated that the decision to reassign Pardo-Kronemann to the Office of International Affairs had nothing to do with his prior informal complaint of retaliation.  Hunter viewed the reassignment as a "positive" for Pardo-Kronemann based upon his experiences and interests, and assigned him to an "important office" needing an "A team." Id. at 49-50, 52.

Because Pardo-Kronemann's reassignment may nevertheless be a material action that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination, and because the Department has asserted "a legitimate, non-discriminatory reason [for the reassignment], the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" Brady, slip op. at 6 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510, 511 (1993)).  The relevant inquiry is whether upon consideration of all of the circumstances presented by the parties a reasonable jury could conclude that the reassignment was retaliatory.  Accordingly, the Court will move on to the Department's proffered legitimate, non-discriminatory explanation for the reassignment and Pardo-Kronemann's arguments of pretext.

### B.      The Proffered Legitimate, Non-Discriminatory Justification

The Department contends that although it "had tried for a decade to find a position within [the Office of General Counsel] that might be mutually agreeable to the parties, no assignment within [that office] seemed suitable." Pl.'s Mot. at 2.  "During Plaintiff's tenure at the [Office of General Counsel], he worked in at least three separate . . . divisions, where either he, or his

supervisors, or both, were dissatisfied with the arrangement."  Def.'s Reply at 6 (citations

omitted); see also Def.'s Statement ¶¶ 2-5; Pl.'s Statement ¶ 20.  When he returned from his detail

to the Inter-American Development Bank, he was technically assigned to the Office of General

Counsel again, and that office was responsible for maintaining his time and attendance records.

Def.'s Ex. 11 ¶ 7.  Yet he was performing work for the Office of the Secretary.  Def.'s Ex. 1 at

146.

At a management meeting in 2001, Hauser, Weidenfeller, Hunter, and Murphy discussed

Pardo-Kronemann's work assignments and the Department's need for better accountability.  Def.'s

Ex. 11 ¶ 6; Def.'s Mot. at 7.  With the confusion as to who Pardo-Kronemann was working for,

management was of the opinion that he "was not doing any work, was keeping sporadic work

hours, and was generally not living up to his obligation as a Federal employee."  Def.'s Ex. 3 ¶ 8.

Pardo-Kronemann concedes that "his transition back to [the Office of General Counsel] 'was not

working out satisfactorily.'"  Pl.'s Responses ¶ 11.

At the meeting, therefore, Hunter suggested that reassigning Pardo-Kronemann to the

Office of International Affairs might be an acceptable solution for all involved.  According to

Hunter:

> It was my contention that this was a positive for the complainant and for the Office of
> International Affairs and for the Secretary, that he would be a positive down there, he had
> the experience, the International Development Bank as a detailee, he had however many
> years experience at HUD, so I was really pushing it, I thought it would be a solution [to]
> the fact that the General Counsel was very concerned that there was somebody working in
> his office that he wasn't sure what he was doing and this would put him in a place where it
> fit his interest internationally . . . .

Pl.'s Ex. K at 49-50.  "Because Plaintiff had expressed an interest in the Office of International

Affairs and international affairs generally, management made the decision to move him to that

office." Pl.'s Mot. at 12.  The Department recognized that Pardo-Kronemann had originally

requested a reinstatement to the international department.  Therefore, they believed he would be

more satisfied and more productive in that office, while the Department could hold him

accountable for his work.  Id. at 2.

C.     **Pretext Analysis**

The Department has put forward a legitimate, non-discriminatory reason for its action, and

therefore Pardo-Kronemann must establish that the asserted explanation is a mere pretext for

unlawful retaliation.[2]  As noted above, the McDonnell Douglas burden-shifting framework is

completed and the sole remaining question is discrimination or retaliation vel non: "to survive

summary judgment the plaintiff must show that a reasonable jury could conclude from all of the

evidence that the adverse employment decision was made for a discriminatory [or retaliatory]

reason."  Lathram, 336 F.3d at 1088.

Pardo-Kronemann first argues that when he returned to HUD after his detail, Associate

General Counsel John Kennedy assigned him to an isolated windowless office space.  Pl.'s

Statement ¶ 28.  Pardo-Kronemann had previously filed a discrimination claim against Kennedy,

and he argues that the office assignment "showed that Kennedy's animus towards [him] remained

at a high level."  Id. ¶ 30.  Even drawing all inferences in Pardo-Kronemann's favor on this

allegation, however, it does little to advance his argument of pretext.  He does not contend that

_____

[2]Pardo-Kronemann's Exhibit W is a settlement agreement from U.S. Dep't of Housing and Urban Dev. v. AFL-CIO Am. Fed. of Gov't Employees, Local 476, Case No. WA-CA-07-0062. The settlement agreement appears unrelated to Pardo-Kronemann, and it is dated May 4, 2007 -- more than five years after the disputed events underlying this action.  Although Pardo-Kronemann occasionally refers the Court to Exhibit W without any specific page numbers, the Court notes that these references are unpersuasive.  Nothing in the settlement agreement sheds any light on Pardo-Kronemann's Title VII claims of retaliation.

Kennedy had anything to do with his reassignment to the Office of International Affairs.  Hence, any animus against Pardo-Kronemann that Kennedy may have harbored does not demonstrate that management's proffered legitimate, non-discriminatory rationale for reassigning him was a pretext for retaliation.

Pardo-Kronemann next contends that his placement in the Office of General Counsel after his detail did not work out because the office never gave him any legal work assignments.  Id. ¶ 35.  Pardo-Kronemann admits, however, that he was performing work for the Office of the Secretary at this time, and he fails to proffer any evidence indicating that he requested any legal work before his reassignment to the Office of International Affairs was under way.  Indeed, he does not indicate that he performed any legal work during his one year detail to the Inter-American Development Bank, and upon his return to HUD, he sought another detail or a political appointment.  According to Pardo-Kronemann's own affidavit, he did not request any legal work until eight months had passed following his return to the Office of General Counsel.  Id. ¶ 38; Pl.'s Ex. Z ¶ 12 (alleging that on October 31, 2001, he told Hauser that he "would welcome legal assignments in [the Office of General Counsel]").  By that time, management had already started the process of reassigning him to the Office of International Affairs, based in part on his previously expressed preference to work in that office.

Considering the entire record, the strength of Pardo-Kronemann's prima facie case, the strength of the Department's legitimate, non-discriminatory rationale, and Pardo-Kronemann's weak arguments of pretext, the Court finds that a reasonable jury could not conclude from all of the evidence that the challenged reassignment was made for a retaliatory reason.  See Patterson v. Johnson, 505 F.3d 1296, 1299 (D.C. Cir. 2007) (affirming summary judgment for the defendant

and finding that the plaintiff's involuntary reassignment to a new position with a "sharp reduction in supervisory responsibilities" was not retaliatory).  The Department's legitimate, non-discriminatory rationale for the reassignment to the Office of International Affairs is overwhelming in comparison to the scant evidence upon which Pardo-Kronemann relies.

## II.     Placement on AWOL Status

### A.     Pardo-Kronemann's Prima Facie Case of Retaliation

Pardo-Kronemann also contends that the Department retaliated against him for his prior EEO activity by listing him as AWOL for January 7 and 8, 2002.  According to Pardo-Kronemann, this action was "draconian" and "appears retaliatory" because Sorzano, who issued the AWOL notice, knew of his previous informal complaint of retaliation and did not want him assigned to her office.  Pl.'s Opp. at 27.  The Department concedes that Pardo-Kronemann can establish the first two elements of a prima facie case, but again protests any causal connection between his 1999 informal complaint and this materially adverse action in early 2002.  As the Department points out, Pardo-Kronemann was placed on AWOL status two years and nine months after he filed his informal complaint and ten months after he had returned to work at HUD following his detail and subsequent leave.

Once again, however, because the Department "has proffered . . . a nondiscriminatory explanation [for the AWOL charge], it has 'done everything that would be required of [it] if the plaintiff had properly made out a prima facie case.'"  Czekalski, 475 F.3d at 364 (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)).  At this point, then, "whether the plaintiff really did so is no longer relevant."  Brady, slip op. at 6; see Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 653-54 (D.C. Cir. 2003); Waterhouse, 298 F.3d at 993 n. 6.

The Court will therefore assume arguendo that Pardo-Kronemann has fulfilled the first part of the burden-shifting framework and will move to the Department's legitimate, non-discriminatory explanation for the action.  See Czekalski, 475 F.3d at 364.

**B.      The Proffered Legitimate, Non-Discriminatory Justification**

The Department contends that Pardo-Kronemann "cannot dispute that he did not follow proper leave request procedure in place at [the Office of International Affairs]."  Def.'s Mot. at 12.  Pardo-Kronemann knew that he was to report to the Office of International Affairs on January 7, 2002, yet when he submitted his leave request for the week beginning on January 7th, he addressed his request to the Office of General Counsel.  Pl.'s Ex. V at 2.  He submitted the form to the Office of General Counsel with a copy to the Office of International Affairs.  When he gave the copy to Linda Watson, an administrator in the Office of International Affairs, she told him that the request would have to be approved by his supervisor, Sorzano.  Def.'s Ex. 14; Def.'s Ex. 5 at 1.  Yet Pardo-Kronemann never made any attempt to talk with Sorzano, and he never obtained her approval.  Hence, when he subsequently did not show up to work on January 7, 2002, Sorzano sent a letter by courier notifying him that he was being listed as AWOL until he returned to work.  Def.'s Ex. 5 at 1.  The Department contends therefore that it had a legitimate, non-discriminatory reason for listing Pardo-Kronemann as AWOL based upon his failure to obtain his supervisor's approval prior to taking leave.

**C.      Pretext Analysis**

Pardo-Kronemann first contends that his failure to follow the proper procedures was due to a "good faith misunderstanding" about the mandatory nature of the reassignment.  Pl.'s Opp. at 11.  He argues that he was under the impression that he could decline the transfer to the Office of

International Affairs, so he did not believe he had to get Sorzano's approval for his leave.  He also argues that he submitted his leave request as he had always done in the past.  Thus, he claims he was not aware that he was not acting in compliance with the applicable regulations.  He ignores the fact that when he submitted his paperwork, Linda Watson told him that he was not following the proper process.  Pl.'s Ex. I at 62-63.

Pardo-Kronemann further asserts that the AWOL response must be retaliatory because Sorzano had never placed anyone on AWOL status before.  Id. at 58.  This fact alone, he argues, demonstrates that she was acting upon a retaliatory motive since she was aware of his previous EEO activity.  However, Sorzano testified that she had never been in a similar situation before; she had never had to address an employee's failure to report to work as directed.  Id.  Thus, the fact that she had never listed anyone as AWOL does little to demonstrate that she was retaliating against Pardo-Kronemann.

Pardo-Kronemann also indicates that Geraghty told him that the decision to declare him AWOL "came from the Tenth Floor, where the office of the Secretary was located."  Pl.'s Opp. at 11; Pl.'s Ex. Z ¶ 10.  Pardo-Kronemann contends that a reasonable jury could therefore infer that the action was a retaliatory one linked to Hunter, who "thought people filing discrimination complaints were 'problems.'"  Pl.'s Opp. at 28.  Not only is this argument extremely speculative, but Pardo-Kronemann cites only to his own affidavit for support.  Although Geraghty was deposed in this matter, Pardo-Kronemann fails to cite any testimony from Geraghty to support these alleged comments.

Finally, Pardo-Kronemann makes the unusual argument that there were no "legitimate business reasons for charging [him] with AWOL" because he had no work assignments to perform

in the Office of International Affairs on those days anyway.  Id. at 12.  Of course, this argument is completely without merit.  Pardo-Kronemann was told to report to the Office of International Affairs on January 7, 2002.  Whether the office had any work assignments waiting for him is beside the point.  Employees cannot simply fail to show up to work whenever they believe they may have no work to perform.  They must still follow the applicable procedures to request leave, and employers obviously have legitimate business reasons for enforcing their procedures.

In attempting to argue pretext, Pardo-Kronemann dances around the simple fact that he failed to get approval for his leave request.  The time lapse between his protected activity and the AWOL assessment, his failure to comply with the procedures required for leave requests in the Office of International Affairs (despite being on verbal notice), and his weak arguments of pretext all support the Court's conclusion that a reasonable jury could not find that the action was retaliatory.  Therefore, summary judgment in the Department's favor will be granted on Pardo-Kronemann's Title VII claim regarding the AWOL charge.

## CONCLUSION

For the foregoing reasons, the Court will grant the Department's motion for summary judgment.  A separate order accompanies this memorandum opinion.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge


Date:  March 31, 2008